IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GWENDOLYN MOORE, as Independent Representative of the ESTATE OF JAMAAL MOORE, SR., deceased; and GWENDOLYN MOORE and JACETA SMITH, both individually, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) No. 13 C 483 |
| CITY OF CHICAGO, a municipal corporation, and CHICAGO POLICE OFFICERS CASTELLI, HACKETT, REIFF, GORMAN, MUTH, NORRIS, and GONZALEZ, | ) ) ) ) ) |
| Defendants. | ) ) |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On December 15, 2012, Jamaal Moore, Sr. ("Jamaal") was shot and killed by Chicago Police Officer Ruth Castelli ("Officer Castelli") after her partner Officer Chris Hackett ("Officer Hackett") ran Jamaal over with a marked police car. Plaintiff Gwendolyn Moore ("Moore") is Jamaal's mother and the Independent Representative of the Estate of Jamaal Moore, Sr. Plaintiff Jaceta Smith ("Smith") is Jamaal's sister. Plaintiffs have sued Officer Castelli, Officer Hackett, and five other Chicago Police officers, as well as the City of Chicago ("City"). Plaintiffs have amended their complaint four times. (Dkt. Nos. 1, 6, 28, 108, 126.) Plaintiffs' fourth amended complaint ("Fourth Amended Complaint") (Dkt. No. 126 ("Am. Compl.")) contains twelve counts: three wrongful death claims filed pursuant to 42 U.S.C. § 1983 and Illinois state law (Counts I through III); three "survival" claims filed pursuant to § 1983 and the Illinois Survival Act, 755 ILCS 5/27-6 (Counts IV through VI); a "survival" claim for failure to intervene filed

pursuant to § 1983 and the Illinois Survival Act (Count VII); a conspiracy claim filed pursuant to § 1983 (Count VIII); an Illinois state law negligence claim for failure to preserve evidence (Count IX); an Illinois state law claim for intentional infliction of emotional distress (Count X); an Illinois state law claim for failure to supervise (Count XI); and an indemnification claim against the City (Count XII). The Chicago Police officers and the City (collectively, "Defendants") have moved for summary judgment on all counts. (Dkt. No. 153.) For the following reasons, Defendants' motion for summary judgment is granted in part and denied in part.

FACTUAL BACKGROUND

I.   <u>The Car Chase</u>

It was raining on the morning of December 15, 2012. (Dkt. No. 155 ("Defs.' SMF") ¶ 15.) At 10:22 a.m. that day, the first of several police broadcasts relayed a robbery in progress at 38th Street and Kedzie Avenue in Chicago, Illinois. (Defs.' SMF ¶ 7.) According to the initial broadcasts, several suspects had broken into the back of a semi-truck, had stolen the televisions inside of the semi-truck's trailer, and were beating the driver of the truck. (*Id.* ¶¶ 5, 7.) Police dispatch further reported that the suspects were traveling in a silver Chevy Trail Blazer with temporary Indiana license plates. (*Id.* ¶ 5.) Approximately thirty minutes after the first broadcasts, police dispatch reported that suspects in the same silver Trail Blazer "broke the seal" of another semi-truck at 54th Street and Western Avenue. (*Id.* ¶ 9.) More than once police dispatch reported that at least one of the suspects was armed. (*Id.* ¶ 8; Defs.' SMF Ex. G at 7:11, 24:5, 25:12.)

At 11:16 a.m., Officers Castelli and Hackett, who were in a marked Chevy Tahoe police vehicle with Officer Hackett driving, observed a silver Trail Blazer with temporary Indiana

plates at the intersection of 51st Street and Western Avenue. (Defs.' SMF ¶ 10-11.) When Officer Hackett "nosed up" to the Trail Blazer to perform a stop, the Trail Blazer turned southbound onto Western Avenue and fled from the officers. (*Id.* ¶ 11.) With their lights and siren activated, Officers Castelli and Hackett gave chase in their police vehicle as the Trail Blazer sped at a high speed down Western Avenue, running red lights, and weaving in and out of traffic. (*Id.* ¶ 12.) At the intersection of Garfield Boulevard and Ashland Avenue, the fleeing Trail Blazer swerved, spun 180 degrees, smashed into a lamppost, and stopped when it collided with a metal fence at a Phillips 66 gas station. (*Id.* ¶ 13.) The car chase lasted approximately one minute and thirty seconds and was captured by the video camera mounted on the dash board of the police vehicle. (Ex. H ("Dash Cam Video") at 00:00-01:30.)

## II.    The Shooting

After the Trail Blazer crashed, four males jumped out of the Trail Blazer and fled on foot. (Defs.' SMF ¶ 14, Ex. I ("Gas Station Video") at 01:32-01:37.) Officer Hackett pulled into the gas station driveway two seconds later and struck Jamaal, who was the last suspect to exit the Trail Blazer. (Defs.' SMF ¶ 15; Gas Station Video at 01:36-01:40.) Officer Hackett testified at his deposition that he hit the brakes but "slid" into Jamaal because of the wet road conditions. (Defs.' SMF ¶ 15; Defs.' SMF Ex. C at 22:4-14.) Sharon Agee, who witnessed the incident, testified that it looked like the police vehicle was "trying to run [Jamaal] over to stop him from fleeing." (Dkt. No. 168 ("Pls.' Resp. to Defs.' SMF") ¶ 15; Pls.' Resp. to Defs.' SMF Ex. 3 at 101:22-24.) The video recordings of the incident do not confirm one account over the other. (Dash Cam Video at 01:36-01:41; Gas Station Video at 01:36-01:41.)

After Officers Castelli and Hackett left their vehicle, they observed Jamaal crawling out from underneath the front of their police vehicle. (*Id.* ¶ 17.) Officer Castelli's service weapon

was drawn. (*Id.* ¶ 16.) Officer Hackett attempted to place Jamaal, who was face down on the ground, in custody by handcuffing Jamaal's hands behind his back. (*Id.* ¶ 17; Defs.' SMF Ex. C at 24:23-25:10.) At the same time, Officer Castelli turned to visually locate the three fleeing suspects and reported on her radio the suspects' direction of flight. (Defs.' SMF ¶ 20; Dash Cam Video at 01:45-01:51.) When Officer Castelli turned back toward Officer Hackett, she saw that Officer Hackett had not yet successfully placed Jamaal in handcuffs. (Defs.' SMF ¶ 21; Dash Cam Video at 01:51-01:52.) Although Defendants contend Officer Castelli saw Officer Hackett in a "vulnerable position" and "losing the fight" with Jamaal, the video recording shows that Officer Hackett remained on top of Jamaal, who was face down on the ground. (Dash Cam Video at 01:51-01:52.) Officer Hackett testified that Jamaal "began to struggle a little bit." (Defs.' SMF Ex. C at 25:12.)

Officer Castelli attempted to holster her weapon to assist Officer Hackett in placing Jamaal in custody. (Dash Cam Video at 01:52-01:53.) As she did so, Jamaal stood up, flipping Officer Hackett over his back in the process. (Defs.' SMF ¶ 22; Dash Cam Video at 01:53-01:54.) Officer Hackett explained at his deposition that he "got too high on [Jamaal's] shoulders," which caused him to be flipped as Jamaal stood up. (Defs.' SMF Ex. C at 25:12-19.)

The parties dispute what happened next. Defendants contend that as Jamaal got off the ground, Officer Castelli saw what she believed to be a gun in Jamaal's right hand. (Defs.' SMF ¶ 25.) According to Defendants, both of Jamaal's arms were pointed in Officer Castelli's direction in a "C" formation, as evidenced by still photographs taken from the Dash Cam Video and Gas

Station Video.[1] (*Id.* ¶ 26-27 (citing (Defs.' SMF Exs. L, M, and O).) Upon seeing the black metal object in Jamaal's right hand pointed in her direction, Defendants assert Officer Castelli shouted "gun, gun," redrew her weapon, and fired two shots in rapid succession. (Defs.' SMF ¶ 28.) The gunshots struck Jamaal in the left lateral hip and the back. (*Id.* ¶ 30.) Officer Castelli has repeatedly stated that she fired at Jamaal "in fear [for] [her] life and [her] partner's life." (*Id.* ¶ 29; Defs.' SMF Ex. B at 28:8-9; Pls.' Resp. to Defs.' SMF Ex. 4 ¶ 40, 75; Pls.' Resp. to Defs.' SMF Ex. 8 at 7.) Plaintiffs contend that Jamaal was not holding anything in his right hand, that Officer Castelli never shouted "gun, gun" before shooting, and that Officer Castelli fired at Jamaal solely to stop him from fleeing. (Pls.' Resp. to Defs.' SMF ¶ 25, 28, 29.)

The Dash Cam Video recording, viewed in the light most favorable to Plaintiffs, does not comport fully with Defendants' version of events. According to that video, Officer Castelli re-raised her service weapon (which was never shown to be fully holstered) immediately after Officer Hackett flipped over Jamaal's back. (Dash Cam Video Fr. 6822-6844.) As Jamaal stood up, he attempted to begin to flee away from Officers Castelli and Hackett. (*Id.* at Fr. 6840-6855.) Officer Castelli, with her service weapon in her right hand, grabbed Jamaal's left arm with her left hand. (*Id.* at Fr. 6850-6863.) As Officer Castelli grabbed Jamaal's left arm, she shot him at point blank range in the left lateral hip. (*Id.* at Fr. 6858-6861.) Jamaal continued to move away from Officer Castelli, either as a continuance of his original movement or from the force of Officer Castelli's first shot, and Officer Castelli was unable to maintain a grip on Jamaal's left

---

[1] Two of Defendants' exhibits provided in support of this fact raise questions. Defendants' Exhibits L and M purport to be still photographs of frames 7276 and 7281 of the Dash Cam Video, both of which purportedly occur at time 2:01. The copy of the Dash Cam Video provided to the court, however, ends at frame 7226, which occurs at time 2:00. (*See* Dash Cam Video at 00:00-02:00.) The court requests that Defendants confirm that Exhibits L and M are simply labeled incorrectly and are not the result of an altered or faulty recording.

arm. (*Id.* at 6865-6870.) Officer Castelli then fired her second shot into Jamaal's back, (*id.* at 6883-6888), from which he died. The Dash Cam Video shows Officer Castelli's pistol slide recoil after both shots. (*Id.*) Defendants' are correct that Defendants' Exhibit O, which is a still photograph of frame 3416 of the Zoomed Gas Station Surveillance Video, shows both of Jamaal's arms pointed toward Officer Castelli in a "C" formation. (Defs.' SMF Ex. O.) Defendants' Ex. O, however, is a still photograph of a time after Officer Castelli fired her first shot, and potentially her second shot into Jamaal's back.[2]

Although the Dash Cam Video undercuts portions Defendants' version of events, it does not establish whether Jamaal was holding an object in his right hand or whether Officer Castelli shouted "gun, gun." James Porter, a witness, testified at his deposition that Jamaal had nothing in his hands when Officer Castelli shot him. (Defs.' SMF Ex. R at 83:5-9.) Cameron Parker, another witness, testified that Jamaal had nothing in his hand when he was "tussling" with Officer Hackett or when he got up to run away. (Defs.' SMF Ex. Q at 26:12-24, 27:1-4.) Officer Hackett did not testify that he noticed anything in Jamaal's hands when he attempted to handcuff Jamaal before the shooting. (Defs.' SMF Ex. C.) Finally, Sharon Agee, another witness on the scene, testified that Officer Castelli did not provide any verbal warnings to Jamaal before she shot him. (Pls.' Resp. to Defs.' SMF ¶ 16, Ex. 3 at 69:9-24, 72:2-3, 72:13-16.)

Dr. Andrienne Segovia, an assistant medical examiner with the Cook County Medical Examiner's Office, performed an autopsy after Jamaal's death and concluded that he died on December 15, 2012 as a result of the gunshot wounds inflicted by Officer Castelli. (Defs.' SMF Ex. P at 6:11-15, 13:22-23, 22: 4-5.)

---

[2]  Moreover, as discussed earlier, Jamaal's left arm was extended toward Officer Castelli because she grabbed it as he attempted to flee. (Dash Cam Video at Fr. 6850-6863.)

III.   The Flashlight Recovery

After the shooting, Officers Hackett and Castelli attempted to secure Jamaal, who was lying on the ground. (Defs.' SMF ¶ 35; Zoomed Gas Station Surveillance Video at 01:55-02:09.) Officer Hackett placed Jamaal into a "bear hug" from behind and rolled both himself and Jamaal onto Officer Hackett's back. (Defs.' SMF ¶ 35; Zoomed Gas Station Surveillance Video at 02:09-02:20.) Officer Castelli stood bent over Jamaal and Officer Hackett. (Zoomed Gas Station Surveillance Video at 02:09-02:20.) Officer Christopher Miller ("Officer Miller") arrived at the scene and replaced Officer Castelli standing over Officer Hackett, who still had Jamaal on the ground in a "bear hug." (Defs.' SMF ¶ 37; Zoomed Gas Station Surveillance Video at 02:21-02:33.) Officer Miller testified that he searched Jamaal, who was on top of Officer Hackett facing upwards, but did not find anything. (Defs.' SMF Ex. T at 43:19-24.) Officers Hackett and Miller then rolled Jamaal onto his stomach and placed his hands in handcuffs behind his back. (*Id.* at 44:1-6; Zoomed Gas Station Surveillance Video at 02:33-02:44.) Officer Miller testified that he again searched Jamaal and did not find anything. (Defs.' SMF Ex. T at 44:6-7.)

Officer Miller testified that after he got up, he noticed a flashlight lying on the ground. (*Id.* at 44:7-9.) This was apparently not captured on any video recording of the incident. Detective Scott Reiff ("Detective Reiff"), who compiled the investigative report of the incident that day, reported that Officers Hackett and Castelli both told him that they discovered a metal flashlight underneath Jamaal. (Pls.' Resp. to Defs.' SMF Ex. 8 ("Incident Report") at 6-7.) Officers Bradley Loduca ("Officer Loduca") and Timothy Westbrooks ("Officer Westbrooks") arrived at the scene after Jamaal was lying on the ground with his hands cuffed behind his back. (Zoomed Gas Station Surveillance Video at 02:44-02:53.) Detective Reiff's Incident Report states that Officer Westbrooks told him that Jamaal was "clutching" to a flashlight in his right

hand. (Incident Report at 7.) The Incident Report states that Officer Loduca told Detective Reiff that Jamaal was "holding" a flashlight in his right hand. (*Id.*)

The parties agree that a flashlight was inventoried by the police as evidence. (Defs.' SMF ¶ 38.) Detective Reiff submitted an affidavit stating that he sent the flashlight to the Illinois State Police for testing on December 31, 2012. (Defs.' SMF Ex. V ¶ 9.) The Forensic Science Center at Chicago, which is a division of the Illinois State Police, received the flashlight on May 28, 2013. (Pls.' Resp. to Defs.' SMF Ex. 14.) Neither party can explain the delay, although Defendants speculate that the flashlight resided with the Illinois State Police between December 31, 2012 and May 28, 2013. (Dkt. No. 179 ("Defs.' Resp. to Pls.' SMF") ¶ 27.) Lisa Kelly, a forensic scientist employed by the Illinois State Police, concluded that Jamaal's DNA and another individual's DNA were on the flashlight. (Defs.' SMF ¶ 41; Defs.' SMF Ex. W at 60:22-24; Pls.' Resp. to Defs.' SMF ¶ 41.) Deborah McGarry, another forensic scientist employed by the Illinois State Police, did not find any fingerprints on the flashlight suitable for testing. (Pls.' Resp. to Defs.' SMF ¶ 28; Pls.' Resp. to Defs.' SMF Ex. 14.)

IV.     The Post-Shooting Scene

After the shooting, a large, volatile crowd began to surround the scene and the officers on site requested additional police officers to secure the crime scene. (Defs.' SMF ¶ 43.) Commander Joseph Gorman ("Commander Gorman"), Sergeant Kevin Muth ("Sergeant Muth"), and Officer Terrence Norris ("Officer Norris") were among the officers who responded after the shooting to secure the crime scene. (*Id.* ¶ 44.) Moore, Jamaal's mother, and Smith, Jamaal's sister, each arrived at the scene at separate times after the shooting. (*Id.* ¶ 45.)

A.  <u>Jaceta Smith</u>

When Smith arrived at the scene, she asked a police officer "What's going on, where's my brother?" to which the unidentified police officer laughed and said "just another nigger dead" and "get the fuck back." (Defs.' SMF ¶ 46.) Smith testified that Officer Norris laughed at her and said "why don't you niggers go spend that welfare check," "you niggers get up out of the street, you niggers," and "you niggers need to go find something better to do." (*Id.* ¶¶ 52-53.) Smith also testified that Officer Norris said he knew who Smith was, where she was from, and that he was going to "catch" her on the street. (*Id.* ¶ 54.) Smith contends that when she confronted Commander Gorman about Officer Norris's comments, he responded by telling her to "just move back." (*Id.* ¶ 57.) Officer Norris denies making any of the statements (*id.* ¶ 55) and Commander Gorman denies being confronted by Smith (*id.* ¶ 61).

Smith testified that she suffers from a feeling of isolation, inability to sleep, inability to function at work, constant headaches, and loss of appetite. (Defs.' SMF ¶¶ 76, 78.) She attributes these problems primarily to Jamaal's death, but feels that the derogatory and racist comments directed at her by the Chicago Police officers are also to blame. (*Id.* ¶ 78.) Smith ended a relationship with a man she was seeing after Jamaal's death. (Pls.' SMF ¶ 38.) Smith started a new job on January 3, 2013. (Defs.' Resp. to Pls.' SMF ¶ 39; Defs.' SMF Ex. CC 13:6-13.) Four days into the job, however, her boss asked to resign because he did not believe she was in "shape" to work because she was feeling the effects of her brother being killed less than one month earlier. (*Id.*) Smith searched on the Internet for free counseling services after Jamaal's death but could not find any. (Pls.' SMF ¶ 40.) She has not visited any counselor, psychologist, or psychiatrist since December 15, 2012. (Defs.' SMF ¶ 80.)

B. Gwendolyn Moore

Moore arrived at the scene separate from Smith. (Defs.' SMF ¶ 47.) She approached an unidentified officer to ask what happened and was told "just another nigger dead." (*Id.* ¶ 47.) Moore testified that Officer Norris, in the presence of Commander Gorman, said "you niggers ain't shit," "all you guys want to do is be on welfare," "you need to go and find you some jobs," "why don't ya'll go and find yourself some jobs." (*Id.* ¶ 52.) Moore testified that when she confronted Commander Gorman about Officer Norris's comments, he responded by saying "ma'am, let's just get to the sidewalk." (*Id.* ¶ 56.) Moore told Sergeant Muth "if you could shoot me right now, you'd do it," to which she claims Sergeant Muth replied "I'd shoot your fucking brains out." (*Id.* ¶ 58.) Moore testified that she confronted Commander Gorman about Sergeant Muth's comments but received no response. (*Id.* ¶ 60.) Commander Gorman did, however, push the officers back. (*Id.*) Officer Norris and Sergeant Muth deny making any racist or derogatory comments to Moore (*id.* ¶¶ 55, 59); Commander Gorman denies that Moore complained to him about Officer Norris or Sergeant Muth (*id.* ¶ 61.)

Since the death of her son, Moore has experienced high levels of anxiety, insomnia, indecisiveness, and a loss of appetite. (Defs.' SMF ¶ 70.) Moore testified that her hair fell out as a result of the incident. (*Id.* ¶ 69.) She has taken time off work. (*Id.* ¶ 71.) On January 7, 2013, Moore was prescribed Lorazepam, an anxiety reducing drug, and Flexeril, a muscle relaxant. (Pls.' SMF ¶ 30.) Between January and May 2013, Moore saw Lois Mieszala ("Mieszala"), a licensed clinical social worker, for a number of counseling sessions. (*Id.* ¶ 31.) Mieszala diagnosed Moore with Post Traumatic Stress Disorder, bereavement, depression, and anxiety resulting from the "incident," which Mieszala described as the death of Moore's son. (Defs.' SMF ¶ 75; Defs.' SMF Ex. DD 23:1-2, 23:21-24:1.) In her deposition testimony, Mieszala did

not mention any discussion of the Chicago Police officers' comments to Moore after the shooting of her son. (Defs.' SMF ¶ 73; Defs.' SMF Ex. DD.)

C. Additional Evidence Recovery

The Chicago Police Department recovered the in-car Dash Cam Video and video surveillance from the gas station, which contained footage of events from approximately two minutes before the shooting until approximately four minutes after the shooting. (Defs.' SMF ¶ 42.) Detective Cullen Murphy, who collected the video surveillance from the gas station, decided to retrieve only the portion of the gas station surveillance video that captured the shooting and immediate aftermath. (Defs. SMF Ex. X at 47:19-23.) According to Plaintiffs' police procedures expert, Timothy Longo, the Chicago Police officers' failure to secure all video footage from the time of the vehicle crash to the release of the crime scene was a "departure from generally accepted practices." (Pls.' SMF ¶ 22; Pls. SMF Ex. 9 at ¶ 355.)

LEGAL STANDARD

A grant of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). "There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." *Brewer* v. *Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). When ruling on a motion for summary judgment, the court must consider the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *Woodruff* v. *Mason*, 542 F.3d 545, 550 (7th Cir. 2008). The court does not make credibility determinations or

weigh conflicting evidence. *McCann* v. *Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

ANALYSIS

I.    <u>Excessive Force and Battery Claims (Counts I through VI)</u>

As a preliminary matter, despite amending their complaint four times, Plaintiffs have failed to plead Counts I through VI properly. First, Plaintiffs improperly combine their federal and state law claims. (Am. Compl. ¶¶ 53-59, 70-72.) Second, Plaintiffs apparently misunderstand the distinction between the Illinois Wrongful Death Act ("Wrongful Death Act"), 740 ILCS 180/1, *et seq.* and the Illinois Survival Act ("Survival Act"), 755 ILCS 5/27-6. Heirs or the estate may sue on behalf of themselves under the Wrongful Death Act, while the estate may sue on behalf of the decedent under the Survival Act. All of Plaintiffs' claims, however, seek to recover on behalf of Jamaal and his heirs under both the Wrongful Death Act and the Survival Act. (Am. Compl. ¶¶ 53-78.)

Notwithstanding Plaintiffs' failure to plead their claims properly, Defendants addressed Plaintiffs' claims as if they were properly pled. (Defs.' Mem. at 3 n.2.) Because Counts I through VI all relate to the shooting incident and can be addressed together, the court will do so as well. The court construes Plaintiffs' excessive force and battery claims as follows: (1) Counts I and IV are construed as a single § 1983 claim against Officer Castelli for use of excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution[3]; (2) Count

---

[3] Both counts improperly seek to recover under the Wrongful Death Act or the Survival Act, and both counts improperly seek damages on behalf of Jamaal's heirs for the loss of society and companionship of Jamaal. *See Russ* v. *Watts*, 414 F.3d 783, 788-90 (7th Cir. 2005) (holding parents cannot recover under § 1983 for loss of society and companionship of Jamaal). The court construes Counts I and IV as a single § 1983 claim separate from Plaintiffs' state law claims.

II is a state law intentional battery claim filed against Officer Castelli under the Wrongful Death Act on behalf of Jamaal's heirs; (3) Count V is a state law intentional battery claim filed against Officer Castelli filed under the Survival Act on behalf of Jamaal; (4) Counts III and VI—which could have been filed as a single claim—are claims for *respondeat superior* against the City for the state law battery claims alleged against Officer Castelli.

Finally, Plaintiffs have suggested throughout this litigation that Officer Hackett intentionally hit Jamaal with his marked police vehicle and Plaintiffs have provided facts in support of that position. (*See* Pls.' Resp. to Defs.' SMF ¶ 15; Pls.' SMF ¶ 15.) Federal Rule of Civil Procedure 15 allows amendment to the pleadings as a case progresses and changes, including when necessary to conform to the evidence. *See Walton* v. *Jennings Community Hosp., Inc.*, 875 F.2d 1317, 1320, n.3 (7th Cir. 1989) (citing Fed. R. Civ. P. 15). If Plaintiffs decide to amend their Fourth Amended Complaint to include an excessive force claim against Officer Hackett, they are free to do so.

A.  Plaintiffs' Excessive Force Claims

Plaintiffs' § 1983 claim is based on an alleged violation of Jamaal's Fourth Amendment right to be free from unreasonable seizures. A police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment and therefore must reasonable. *See Tennessee* v. *Garner*, 471 U.S. 1, 7 (1985). In *Garner*, the Supreme Court articulated the principles for determining whether the use of deadly force is reasonable under the Fourth Amendment:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious

physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11-12. The court evaluates claims of excessive force under an objective reasonableness standard, which means that the court must ask "whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Graham* v. *O'Connor*, 490 U.S. 386, 388-97 (1989). Situations which may seem "tame in hindsight" may have been "uncertain and potentially dangerous at the time." *Stepan* v. *City of Evanston*, No. 91 C 6713, 1993 WL 210534, *3 (N.D. Ill. June 11, 1993) (Holderman, J.).

Defendants first argue that Officer Castelli's use of deadly force was reasonable because she believed that Jamaal threatened her and her partner's life with a weapon. Although "the *Graham* reasonableness inquiry nearly always requires a jury to sift through disputed factual contentions," *Abdullah* v. *City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005), the Seventh Circuit has held that where the suspect threatens the officer with a weapon, "the risk of serious physical harm to the officer has been established." *Scott* v. *Edinburg*, 346 F.3d 752, 756 (citing *Bell* v. *Irwin*, 321 F.3d 637, 639 (7th Cir. 2003)). Defendants claim that Jamaal committed a violent aggravated battery of Officer Hackett, pointed both of his arms in Officer Castelli's direction, and had an object in his hand that Officer Castelli believed to be a gun. (*Id.* at 4.) Notwithstanding Defendants' assertion that "there are no material factual disputes about [Officer] Castelli's use of force," (Dkt. No. 178 ("Defs.' Reply") at 2), each of the foregoing facts is disputed. First, Officer Hackett testified that because he was too high on Jamaal's shoulders, he "got flipped" when Jamaal attempted to stand up (Defs.' SMF Ex. C at 25:12-19); a reasonable jury could find that Jamaal did not commit an aggravated battery. Second, the Dash Cam Video shows that Jamaal's left arm was pointed at Castelli only because she grabbed it, and

- 14 -

the Gas Station Surveillance Video shows that his right arm was pointed at Officer Castelli only after she fired her first shot. Third, although Officer Castelli testified that Jamaal had an object in his right hand, two witnesses testified that Jamaal had nothing in his right hand when he was shot. At the summary judgment phase, the court must view the evidence in the light most favorable to the opposing party and does not make credibility determinations or weigh conflicting evidence. *See, e.g.*, *Tolan* v. *Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal citations omitted).

Defendants next argue, in the alternative, that Officer Castelli's use of deadly force was necessary to prevent Jamaal's escape. (Defs.' Mem. at 5.) According to the Supreme Court, the use of deadly force is unreasonable if intended merely to prevent a felon's escape. *Garner*, 471 U.S. at 11-12; *see also Ford* v. *Childers*, 855 F.2d 1271, 1276 (7th Cir. 1988) ("[T]he firing of a weapon must never become an automatic response to the law enforcement officer when attempting to capture a fleeing felon.") If, however, the officer has probable cause to believe that the subject has committed a crime involving the infliction of serious harm, "deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11-12. Because probable cause "turns on the assessment of probabilities in particular factual contexts . . . it is usually a jury question." *Ford*, 855 F.2d at 1275 (internal citations omitted). If the material facts are not disputed, a court may find probable cause as a matter of law. *See Maxwell* v. *City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993).

Defendants have presented facts that might establish that Officer Castelli had probable cause to believe that Jamaal had committed a violent crime. But Defendants have presented no facts purporting to show that Jamaal was, in fact, attempting to escape when Officer Castelli fired her weapon. Officers Castelli and Hackett have repeatedly stated that Officer Castelli fired

her weapon because she believed Jamaal had a gun and she "fear[ed] [for] [her] life and [her] partner's life." (Defs.' SMF Ex. B at 28:5-13; Defs.' SMF Ex. C at 27:7-13; Pls.' SMF Ex. 4 ¶¶ 40, 75; Pls.' SMF Ex. 8 at 6-7.) Officer Castelli has never provided any other basis for using deadly force. (Pls.' SMF ¶ 14.) Defendants' own Statement of Uncontested Facts portrays Jamaal as an armed aggressor, pointing both of his arms at Officer Castelli, at the time he was shot; it does state that Jamaal attempted to flee after freeing himself from Officer Hackett. (Defs. SMF ¶¶ 24-30.) Defendants cannot credibly claim that deadly force was *necessary* to prevent Jamaal from escaping while simultaneously denying that Officer Castelli shot Jamaal to prevent his escape.

Defendants finally argue that Officer Castelli is entitled to qualified immunity on Plaintiffs' excessive force claims. Defendants rest their defense on the second prong of the qualified immunity analysis, which requires the court to ask whether the right in question was "clearly established" at the time of the alleged violation. *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982)). Defendants assert that a reasonable officer standing in Officer Castelli's position "could have believed, based upon the specific facts confronting her, the use of deadly force was permissible." (Defs.' Mem. at 7.) Although qualified immunity is an entitlement not to stand trial, the general rule of summary judgment still applies: "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866. As discussed at length above, Officer Castelli's sole basis for using deadly force—Jamaal's possession of an object she believed to be a gun—is in hot dispute. Absent Jamaal's possession of an object, this case does not fall in the "hazy border between excessive and acceptable force"; a reasonable officer in Officer Castelli's

position would have understood the use of deadly force to be excessive.[4] *See Brosseau* v. *Hagen*, 543 U.S. 194, 201 (2004) (citing *Saucier* v. *Katz*, 533 U.S. 194, 206 (2001)). "[I]f the parties [are] disputing who did what, when, any question of qualified immunity [must] wait until those fact issues [are] resolved." *Meyer* v. *Robinson*, 992 F.2d 734, 737 (7th Cir. 1993). Accordingly, because the question of immunity rests on a disputed fact, the court cannot grant summary judgment in Defendants' favor on the basis of qualified immunity.

B.  Plaintiffs' State Law Claims

Defendants' contend that the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("Illinois Tort Immunity Act") shields Officer Castelli from liability on Plaintiffs' state law battery claims. The Illinois Tort Immunity Act provides as follows: "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. Because summary judgment is not proper on Defendants' qualified immunity defense, summary judgment is similarly improper on Plaintiffs' state law battery claims under the Wrongful Death Act and the Survival Act. *See Estate of Palma* v. *Edwards*, No. 99 C 4896, 2001 WL 1104716, *4 (N.D. Ill. 2001) (Guzman, J.) (citing Chlopek v. *Jarmusz*, 877 F. Supp. 1189, 1197 (N.D. Ill. 1995) (Norgle, J.)). Moreover, summary judgment is inappropriate for the claims against the City

---

[4]  The court cannot consider whether a reasonable officer would have understood deadly force to be acceptable to prevent Jamaal from escaping because Defendants do not contend that Officer Castelli shot Jamaal to prevent him from escaping. Defendants also do not argue that Officer Hackett's running over Jamaal with the marked police vehicle was to prevent Jamaal from escaping. Because the court must draw all inferences at this point in Plaintiffs' favor, the court at this stage of the litigation must infer that Officer Hackett's driving his marked police vehicle as he did was not done to prevent Jamaal's escape.

because it is still possible for a jury to find the City liable under the doctrine of *respondeat superior*.

For the reasons stated above, Defendants' motion for summary judgment on Counts I through VI of Plaintiffs' Fourth Amended Complaint is denied.

II.     § 1983 Failure to Intervene (Count VII)

In Count VII, Plaintiffs allege that Officers Castelli, Hackett, Gonzalez, Muth, Norris, and Commander Gorman violated § 1983 by failing to intervene to prevent Officer Castelli's use of deadly force in violation of the Fourth Amendment. (Am. Compl. ¶¶ 79-85.) Plaintiffs have provided no facts showing that any officer "had a realistic opportunity to intervene to prevent the harm from occurring." *Yang* v. *Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). The evidence from the Dash Cam Video clearly shows that Officer Hackett, the only officer on the scene when Jamaal was shot, was on his back after recently being flipped by Jamaal. In their response, and without explanation, Plaintiffs attempt to voluntarily dismiss Count VII.

Because Defendants have filed a motion for summary judgment, Plaintiffs may dismiss Count VII "only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). Dismissal of a claim under Rule 41(a)(2) is within the sound discretion of the district court. *Kovaliv* v. *DEC Int'l, Inc.*, 855 F.2d 471, 471 (7th Cir. 1988). Here, Plaintiffs included their § 1983 claim in their first complaint (Dkt. No. 1 ¶¶ 34-35) and each of their subsequent four complaints (Dkt. Nos. 6, 28, 108, 126). Plaintiffs provide no explanation for why they have included the failure to intervene claim—which is clearly undermined by the video evidence—in each amended complaint or why now, at the summary judgment stage of this litigation, they have chosen to drop it. Accordingly, the court denies Plaintiffs' request to voluntarily dismiss Count VII and grants Defendants' motion for summary judgment on Count VII.

III.    Civil Conspiracy (Count VIII)

In Count VIII, Plaintiffs allege that the City, Detective Reiff, Officers Hackett and Castelli, and other unknown police officers conspired to create false statements, reports, and evidence that Officer Castelli suspected Jamaal had a weapon in his possession when she shot and killed him.[5] Plaintiffs bring their claim under § 1983, but do not clarify whether they are seeking relief on behalf of Jamaal or his estate and heirs. The court interprets Plaintiffs' position to seek relief on behalf of Jamaal's estate and heirs. *See Bell* v. *City of Milwaukee*, 746 F.2d 1205, 1264 (7th Cir. 1984); *see also Nelson* v. *City of Harvery*, No. 00 C 6145, 2001 WL 930790, *2 (N.D. Ill. Aug. 16, 2001) (Holderman, J.) (holding plaintiffs cannot state a claim for deprivation of constitutional rights on behalf decedent, because conspiracy occurred after decedent's death, at which time his constitutional rights had been extinguished).

Conspiracy is not an independent basis for liability under § 1983. Although the Seventh Circuit has recognized a § 1983 claim where police officers attempt to conceal unlawful conduct, the basis for the claim lies in the denial of a plaintiff's right of access to the courts. *Vasquez* v. *Hernandez*, 60 F.3d 325, 328-29 (7th Cir. 1995); *see also Kies* v. *City of Aurora*, 149 F. Supp. 2d 421, 424 (N.D. Ill. 2001) (Alesia, J.) ("[C]oncealment of constitutional violations, such as false arrest, excessive force, and malicious prosecution, are insufficient to raise a separate constitutional violation unless the victim is deprived of his or her right to access to the courts.") (internal citations and quotations omitted). Furthermore, in order to deny a plaintiff access to the courts, the cover-up must be to some extent successful. *See Cefalu* v. *Vill. of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) ("[A]n attempt to cover up police wrongdoing which succeeded only

---

[5]    Plaintiffs have voluntarily dropped their claims against the "unknown officers." (Pls.' Resp. at 14.)

briefly in hiding the facts from the plaintiffs, and which ultimately neither prevented the plaintiffs from pursuing relief nor reduced the value of their claim, was not actionable under section 1983.")

In the face of this case law, Plaintiffs have not provided facts showing how the alleged cover-up deprived them of access to the courts. (*See* Pls.' Resp. at 8-9.) A claim for denial of access to the courts requires (i) a deprivation of the information necessary to bring a meritorious suit and obtain an adequate remedy and (ii) a concrete injury resulting from the cover-up. *Gibson* v. *City of Chicago*, 910 F.2d 1510, 1523-24 (7th Cir. 1990). Plaintiffs do not lack the information necessary to bring a meritorious suit; they have, and have had, access to the evidence—in the form of eyewitness testimony—refuting the presence of a flashlight and Officer Castelli's pre-shooting warning. *See Cefalu*, 211 F.3d at 424 (holding "a jury could not find for the plaintiffs on the cover-up claim because the facts that they needed to recover for their asserted injuries have always been known to them"). Plaintiffs have similarly not suffered a concrete injury. Plaintiffs' case has survived Defendants' summary judgment motion on Plaintiffs' excessive force and battery claims. Plaintiffs will have the opportunity to present evidence of those claims at trial, along with evidence refuting the presence of a flashlight and Officer Castelli's verbal warning, to the jury selected at trial to decide this case. *See, e.g.*, *Vasquez* v. *Hernandez*, 60 F.3d 325, 329 (7th Cir. 1995) (no injury where "cover up failed" because suit was filed only six months later). Accordingly, because Plaintiffs have failed to provide facts showing that they have been deprived of access to the courts, Defendants' motion for summary judgment on Count VIII of Plaintiffs' Fourth Amended Complaint is granted.

IV.     Negligent Spoliation (Count IX)

In Count IX, Plaintiffs allege that Officer Hackett, Officer Castelli, Detective Reiff, and the City "failed to exercise reasonable care in preserving evidence" when Defendants (i) recorded false and fabricated witness statements concerning the shooting and (ii) failed to preserve video footage of the entire incident, including the processing of the crime scene. (Am. Compl. ¶¶ 98.) In their response, Plaintiffs clarify that Count IX is a state law claim for negligent spoliation of evidence and Plaintiffs address only their claim regarding Defendants' failure to collect all of the video surveillance from the gas station. (Pls.' Resp. at 14.) In any event, Plaintiffs' claim concerning the fabrication of witness statements is merely a recitation of their conspiracy allegations and is not properly pled as negligence. Consequently, the court will address only Plaintiffs' claim that Defendants negligently declined to retrieve portions of the video surveillance that would support Plaintiffs' claims for intentional infliction of emotional distress. (Pls.' Resp. at 14.)

Under Illinois law, negligent spoliation is not an independent tort; it is merely a type of negligence. *Borsellino* v. *Goldman Sachs Grp., Inc.*, 477 F.3d 502, 510 (7th Cir. 2007) (citing *Boyd* v. *Travelers Ins. Co.*, 652 N.E.2d 267, 269-70 (Ill. 1995)). Defendants, however, are immune from claims of negligence under the Illinois Tort Immunity Act, 745 ILCS 10/2-201, which provides in relevant part: "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused."

In their response to Defendants' motion for summary judgment, Plaintiffs also assert, for the first time, that Defendants "intentionally destroyed" the video of the crime scene processing.

(Pls.' Resp. at 14.) Plaintiffs' claim is wholly frivolous and undermined by the undisputed facts. Specifically, Plaintiffs admit that Detective Murphy—who is not named in Count IX—decided to retrieve only a small portion of the video (showing the shooting) from the gas station surveillance camera, which is the camera that would have captured the crime scene processing. (Pls.' Resp. to Defs.' SMF ¶ 42.) Plaintiffs previously argued that Detective Murphy's decision was negligent. Plaintiffs cannot now claim, with full knowledge that the police never retrieved the remainder of the video from the gas station, that Defendants destroyed the video evidence.

V.     IIED Claims (Counts X and XI)

In Count X, plaintiffs Moore and Smith allege that Officers Norris and Muth intentionally inflicted emotional distress ("IIED") by repeatedly using the term "nigger" as part of a series of derogatory statements directed at Moore and Smith.[6] (Am. Compl. ¶¶ 101-108.) Under Illinois law, a plaintiff seeking to recover damages for an IIED claim must establish that: "(1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress." *Naeem* v. *McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006) (citations omitted). The standard for an IIED claim is high, and "under no circumstances [do] mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities qualify as outrageous conduct." *Feltmeier* v. *Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (internal citations and quotations omitted).

---

[6]    In their Fourth Amended Complaint, Plaintiffs allege that Commander Gorman also made racist comments. Plaintiffs appear to have dropped Commander Gorman from Count X because they declined to provide any facts showing he made any offensive comments.

"Rather, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Id.* at 80-81.

Faced with this high standard, Plaintiffs do not cite any cases holding that comments similar to those made by Officers Muth and Norris qualify as "extreme and outrageous." Instead, Plaintiffs simply argue that any use of the word "nigger" by a person in power qualifies as "extreme and outrageous." (Pls.' Resp. at 11.) As offensive as that word may be to many people, including this court, the weight of the existing Seventh Circuit case law holds otherwise. S*ee Oates* v. *Discovery Zone*, 116 F.3d 1161, 1174 (7th Cir. 1997) (supervisor's refusal to remove a picture depicting firm's only African-American employee as a monkey not extreme and outrageous conduct); *Harriston* v. *Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993) (intentional racially discriminatory acts not extreme and outrageous conduct). Other federal judges in this district have held the same. *See, e.g.*, *Golden* v. *World Sec. Agency, Inc.*, 884 F.Supp.2d 675, 697 (N.D. Ill. 2012) (Kennelly, J.) (supervisor calling employee "nigger," "monkey," and showing pictures of light beer cans wearing KKK-style hoods surrounding "darker-colored beer bottle hanging from a rope" cannot support claim for IIED); *Washington* v. *Vill. of Riverside*, No. 01 C 7438, 2003 WL 1193347, *9 (N.D. Ill. Mar. 13, 2003) (Keys, M.J.) (police officers' use of racial slurs not extreme and outrageous conduct); Harper v. Mega, No. 96 C 1892, 1998 WL 473427, *8 (N.D. Ill. Aug. 7, 1998) (Manning, J.) (police officers calling arrestee "nigger," "monkey," and similar racist slurs insufficient for a claim of IIED); *Briggs* v. *N. Shore Sanitary Dist.*, 914 F. Supp. 245, 252 (N.D. Ill. 1996) (Aspen, J.) (subjecting employee to racial slurs and hanging "pickaninny" doll in office not extreme and outrageous conduct).

Officer Norris's and Officer Muth's comments were racist and offensive. They do not, however, meet the high standard necessary to satisfy the "extreme and outrageous" requirement

under Illinois law. Because the court holds that Plaintiffs have failed to satisfy the threshold requirement for an IIED claim, the court need not consider whether Officer Norris's and Officer Muth's comments actually caused severe emotional distress, although Plaintiffs have provided few, if any, facts showing Smith and Moore's distress was caused by the officers' comments rather than Jamaal's death. The court grants Defendants' motion for summary judgment on Count X of Plaintiffs' Fourth Amended Complaint.

In Count XI, Plaintiffs bring a state law "failure to supervise" claim against Commander Gorman for failing to prevent Officers Norris and Muth from intentionally inflicting emotional distress on Smith and Gwendolyn Jamaal. (Am. Compl. ¶¶ 109-115.) Although Plaintiffs again confuse the requirements of a failure to supervise claim under Illinois law with those of a § 1983 *Monell* claim, (*see* Pls.' Resp. at 13), the court need not belabor the distinction between federal and state law (again). Plaintiffs' claim against Commander Gorman is based on the IIED claims. Because the court granted Defendants' summary judgment on Count X, the IIED claims alleged therein cannot form the basis for Plaintiffs' failure to supervise claim in Count XI. Defendants' motion for summary judgment on Count XI of Plaintiffs' Fourth Amended Complaint is granted.

VI.    City of Chicago

Because it is still possible for a jury to find Officer Castelli, a City employee, liable for Counts I through VI, summary judgment is denied on Count XII, which is a claim for indemnification under the Illinois Tort Immunity Act, 745 ILCS 10/9-102.

CONCLUSION

For the reasons explained in this memorandum opinion, the court rules as follows: Defendants' motion for summary judgment [153] is denied with respect to Counts I, II, III, IV, V, VI, and XII of Plaintiffs' Fourth Amended Complaint [126], and granted as to Counts VII

through XI. Defendant Chicago Police Officers Reiff, Gorman, Muth, Norris, and Gonzalez are dismissed from this case with prejudice. The only defendants remaining in this case are Officer Ruth Castelli, Officer Chris Hackett, and the City of Chicago. The Final Pretrial Conference remains set for 7/9/14 at 4:00 p.m. The jury trial remains set to begin on 7/14/14 at 9:00 a.m. The parties are strongly encouraged to discuss settlement regarding the remaining claims which, if not settled by agreement, will proceed to trial before a jury.

ENTER:

*James F. Holderman*

JAMES F. HOLDERMAN
District Judge, United States District Court

Date: May 30, 2014